[Sac. No. 2271.   Department One.—December 19, 1916.]

## HINE G. MONSEN, Respondent, v. MARY ANNIE MONSEN, Executrix, etc., et al., Appellants.

CONTRACT—AGREEMENT TO DEVISE PROPERTY—SPECIFIC PERFORMANCE.—A man may make a valid contract binding himself to dispose of his property in a particular way by last will and testament, and a court of equity will enforce such an agreement specifically by treating the heirs as trustees and compelling them to convey the property in accordance with the terms of the contract.

ID.—STATUTE OF FRAUDS—ORAL CONTRACT MADE PRIOR TO CODE AMENDMENTS—VALIDITY NOT AFFECTED BY.—The amendments to section 1624 of the Civil Code and section 1973 of the Code of Civil Procedure, bringing agreements to make provisions for persons by wills within the scope of the statute of frauds, have no application to an agreement made prior to such amendments.

ID.—CERTAINTY OF TERMS OF CONTRACT—ESSENTIAL CONDITION.—The requirement of section 3390 of the Civil Code, that an agreement cannot be specifically enforced unless the terms thereof are sufficiently certain to make the precise act which is to be done clearly ascertainable, is applicable to contracts to dispose of property by will.

ID.—EVIDENCE—INSUFFICIENT PROOF OF CONTRACT.—In an action for the specific performance of an alleged oral contract to leave to plaintiff a child's share of an estate, evidence that the deceased and his wife agreed to take the plaintiff and treat him as their child, and that they indicated that he should succeed to their property, and at one time made a will, making him the sole beneficiary, which they showed to him, is insufficient to support the precise contract alleged and found.

ID.—APPEAL—FINDINGS ON CONFLICTING EVIDENCE—SCOPE OF RULE.—The rule that the findings of a trial court upon conflicting evidence are conclusive on the appellate courts, and that all reasonable inferences are to be indulged to support the findings, does not justify the sustaining of a finding when it has not the support of substantial evidence.

APPEAL from a judgment of the Superior Court of Colusa County.   H. M. Albery, Judge.

The facts are stated in the opinion of the court.

U. W. Brown, and Frank Freeman, for Appellants.

Francis St. J. Fox, Thomas Rutledge, J. P. Langhorne, and N. J. Manson, for Respondent.

SLOSS, J.—The defendants, claiming as executors and beneficiaries under the will of Friedriech Monsen, deceased, appeal from a judgment enforcing an alleged contract by which the decedent had agreed that the plaintiff should receive and inherit a child's share of the property which said decedent might leave.

The action is of a type familiar in this court, and illustrated by a line of decisions beginning with *Owens* v. *McNally,* 113 Cal. 444, [33 L. R. A. 369, 45 Pac. 710]. As was said in that case, there has been "from a very early date a general concurrence among the authorities upon the proposition that a man may make a valid contract binding himself to dispose of his property in a particular way by last will and testament, and a court of equity will enforce such an agreement specifically by treating the heirs as trustees and compelling them to convey the property in accordance with the terms of the contract." Without referring to the numerous decisions in other jurisdictions, we make note of the cases in which the rule, as thus declared, has been recognized here. (*McCabe* v. *Healy,* 138 Cal. 81, [70 Pac. 1008] ; *Baumann* v. *Kusian,* 164 Cal. 582, [44 L. R. A. (N. S.) 756, 129 Pac. 986] ; *Rogers* v. *Schlotterback,* 167 Cal. 35, [138 Pac. 728] ; *Blanc* v. *Connor,* 167 Cal. 719, [141 Pac. 217].) In the case at bar, as in those cited, the plaintiff relied upon a parol agreement. It may not be amiss to point out the manifest danger of fraud, perjury, and injustice that may inhere in a recognition of the right to alter, by parol testimony, the course of disposition of the property of a decedent. It was, no doubt, a recognition of this danger that led the legislature to adopt the amendments to section 1624 of the Civil Code and section 1973 of the Code of Civil Procedure, bringing agreements of this character within the scope of the statute of frauds. The agreement here relied upon was, however, claimed to have been made, and executed, on plaintiff's part, long prior to the changes in the codes, and its validity is not affected by them. (*Rogers* v. *Schlotterback,* 167 Cal. 35, [128 Pac. 728].)

While the cases which we have cited declare the propriety of an enforcement, in equity, of contracts to make a particular disposition of property upon the death of the promisor, they all agree that enforcement will not be decreed except upon the conditions applicable to all demands for specific performance. One of these is that the terms of the agreement

must be definite and certain.   Section 3390 of the Civil Code, in enumerating the obligations which cannot be specifically enforced, concludes: "(6) An agreement, the terms of which are not sufficiently certain to make the precise act which is to be done clearly ascertainable."   In *Owens* v. *McNally*, the court used this language: "Where a contract such as this, resting in parol and sought to be enforced after the death of the other party to it, comes before a court of equity for review, it is scrutinized, and should be scrutinized, with particular care, and only upon a satisfactory showing that it is definite and certain and just will it be enforced.   The proofs of the contract should be clear, and the acts of the claimant referable alone to the contract."   *McCabe* v. *Healy* recognizes the same doctrine, although it was there held that the contract was sufficiently certain.   In *Baumann* v. *Kusian,* we find in the opinion the statement that "it is well settled that to warrant specific enforcement of a contract of the character here alleged the contract must be definite and certain."   In *Rogers* v. *Schlotterback,* the court says that a contract of the kind here alleged will be enforced "if such a contract may fairly be said to be clearly and satisfactorily shown, if it is clear, certain, and definite in its terms; and if specific performance would not be harsh and oppressive and unjust to innocent third parties. . . ."   Finally, in *Blanc* v. *Connor,* 167 Cal. 719, [141 Pac. 217], the court, after reviewing the earlier cases, again emphasized the rule that "proof of the contract to make a certain kind of will must be definite and distinct before a chancellor will enforce specific performance."

Plaintiff was the son of Peter Grevie and Fredrika, his wife.   The Grevies had two other sons, both older than plaintiff.   The family lived on a farm in Colusa County.   Friedriech Monsen and Magdalena, his wife, were a childless couple residing on a farm near that of the Grevies.   Peter Grevie and Friedriech Monsen were brothers of the half blood.   The plaintiff was born in March, 1883.   His mother died in April of the same year, and a few months later the plaintiff was put in charge of the Monsens.   He remained with them during his childhood, receiving nurture and education at their hands.   He took, or was given, their name, being known as Hine G. Monsen, and it is perfectly apparent from the evidence that the relations which grew up between him and the

Monsens were of a warmly affectionate kind. In 1904 Magdalena Monsen died. In 1907 Friedriech Monsen married Mary Annie Fuerstein, and two sons were born of that marriage. Friedriech Monsen died April 2, 1913, leaving a will and codicil by which he disposed of his entire estate (appraised at about one hundred and fifteen thousand dollars) to persons other than the plaintiff.

The agreement on which plaintiff relies is set forth in his complaint with great detail and particularity, and the findings follow the allegations of the complaint. Briefly stated, it is averred and found that in September, 1889, Peter Grevie, plaintiff's father, and Friedriech Monsen, for the benefit of the plaintiff, entered into a contract whereby Peter Grevie promised and agreed that he would surrender his said son to Friedriech Monsen to adopt, have, and keep as said Monsen's son, and would renounce and waive all his claims as father of said plaintiff, and in consideration thereof Monsen agreed with said Peter Grevie for plaintiff's benefit that said Monsen would, and he did thereby, accept and adopt plaintiff as his own son, and would protect and maintain and provide for him as such son, and would in every way become responsible for his moral and physical welfare, and would assume all responsibility for the debts of said plaintiff to be incurred, and he further agreed that upon the death of the said Friedriech Monsen the said plaintiff "should have, receive, and inherit, and should be and become entitled to and vested with a child's and son's share of all of the property, both real and personal, of which the said Friedriech Monsen might die seised or possessed, in the same manner and to the same effect as if he, the said plaintiff, Hine G. Monsen, were a child and son and heir at law of the said Friedriech Monsen, deceased, and as a child and son and heir at law of the said Friedriech Monsen, deceased." Having found the agreement as thus outlined, the court drew the conclusion of law that plaintiff was entitled to receive one-third of the estate of Friedriech Monsen, subject to costs of administration, and judgment was entered accordingly.

When we come to examine the record, we fail to find in it any substantial evidence showing "clearly and satisfactorily," or at all, the making of the contract described with such precision in the complaint and the findings. The only witness who undertook to give direct testimony that a contract

of any kind had been entered into was the plaintiff himself.
As already stated, the plaintiff first came into Monsen's
family when he was a few months old. Some five years later
Peter Grevie, his father, came to the Monsen house to take
the plaintiff away. Plaintiff's testimony was that upon this
occasion his father said, "I have come to take you home with
me. Mrs. Monsen interrupted, saying, 'Peter, Hine is our
boy. It was understood by us that he was our boy when we
took him.' After this . . . a very heated discussion oc-
curred, at the close of which Peter Grevie said, 'You can have
the boy.'" In this conversation, the recital of which, as al-
ready stated, constituted the only direct testimony of an
agreement, there was not a word said about inheritance, or
testamentary disposition, or, indeed, about property at all.
The further evidence on respondent's part consisted of proof
of the Monsens' acts and declarations, offered as the basis for
an inference that the agreement pleaded had been made. We
think that these items of evidence, taken collectively, fall far
short of proving the making of the contract alleged and
found. We shall not extend this opinion so far as to recite
all of this evidence. Many of the statements tend to show,
merely, the deep affection entertained by Friedriech Monsen
and his wife for the plaintiff, that they treated him as a son,
and that they bestowed many material and other kindnesses
upon him. This evidence could support, at the utmost, an
inference that the Monsens had agreed to take plaintiff and
treat him as their child. Inasmuch, however, as a parent is
under no legal obligation to give his property by will to a
child, no cause of action would arise from such a contract.
(*Baumann* v. *Kusian*, 164 Cal. 582, [44 L. R. A. (N. S.) 756,
129 Pac. 986].) We shall refer, briefly, to the items of evi-
dence which may be thought to bear more directly upon the
alleged making of the contract pleaded. The earliest state-
ment testified to is one made by Mrs. Magdalena Monsen to a
witness (Miss Boggs), and having reference, apparently, to
the plaintiff's original coming into the Monsen family, some
years prior to the time when Peter Grevie came to take his
child away. This witness testified that Mrs. Magdalena Mon-
sen had told her that soon after plaintiff's birth his mother
died and his father asked her, Mrs. Monsen, to take care of
the baby for him, and that she said, "I will not do it that
way. If you will give me the baby for my own I will do the

best I can for him." This, of course, is entirely insufficient to show any agreement by Mrs. Monsen, still less by her husband, to give to plaintiff a "child's share" of the husband's estate.

There was evidence that both Monsen and his first wife had made wills by which they had made the plaintiff the sole beneficiary, and that they had shown these wills to him. This indicates that the Monsens, at the time of making the wills, desired that plaintiff should succeed to their property. It indicates no more. The making of a will has no tendency to show that there is a contractual obligation to make such will.

To the witness Wilkins, Monsen said: "I took a boy from Mr. Grevie and legally adopted him and made him my heir." The statement that he had "legally adopted" plaintiff, if made, was not true. There is no claim that any legal adoption had ever taken place. The statement that he had made him his heir is fully explained by the showing that he had made a will leaving everything to the plaintiff. It certainly does not show that he had bound himself by agreement to make such provision. Testimony of several witnesses that the Monsens had said that they would leave the plaintiff all they had, or that "they intended" that he should get their property, is entitled to no greater weight. All of this evidence is similar in character to that under consideration in *Ackerman* v. *Ackerman's Exrs.*, 24 N. J. Eq. 585, 586 (cited with approval in *Owens* v. *McNally*, 113 Cal. 444, [33 L. R. A. 369, 45 Pac. 710]), of which the court said "the complainant's evidence chiefly consists of loose conversations had by different persons with the testator . . . all of which evidence is consistent with a purpose, at one time, on the part of the father, to devise the farm to Gilbert and Gilbert's expectation that he would . . . but which fails to show any contract for the conveyance or devise of the farm, intended to be obligatory either upon the father or son."

One other item of evidence deserves specific mention. The plaintiff testified that the Monsens kept their wills in a safe, and that with these wills were duplicate copies of a memorandum which he had seen several times, the last occasion being some seven years before the trial. He did not undertake to give the exact wording of the memorandum, but declared that "it stated something like this: 'We want it understood that we have raised and adopted Hine G. Monsen, and

that at the time of our death, we want all of the property that we possess at that time to go to him.' I believe it also stated at the conclusion that 'This being in accordance with an agreement with Peter Grevie.' " This vague and uncertain testimony does not meet the requirements of the rule that there must be clear and distinct evidence of the precise terms of an agreement to devise or to make one an heir. The memorandum, as recalled by the witness, leaves the terms of the agreement indefinite in various respects. There is nothing to indicate what was to be done in return for the agreement of the Monsens, or what other consideration, if any, there was for their agreement. Again, so far as the language quoted shows, the obligation assumed by the Monsens under their "agreement with Peter Grevie" was simply that the plaintiff should be raised and adopted by them. The words, "we want . . . the property . . . to go to him," are suggestive of a present desire rather than of a contractual obligation to have the property go thus. Something of the same uncertainty attaches to the plaintiff's testimony that Monsen had once said to him that he had made another will in his favor, "and this will is in accordance with an agreement with your father leaving all the property to you." It must be remembered that testimony of oral declarations or admissions (particularly those of persons who have been silenced by death) form a class of evidence which is not highly favored in the law. "Admissions are generally regarded as weak evidence for the proof of a fact, and are never conclusive of the facts stated, or of the inferences to be drawn therefrom; and our statute requires the jury to be instructed, on all proper occasions, 'that the evidence of the oral admissions of a party ought to be viewed with caution.' (Code Civ. Proc., sec. 2061, subd. 4.)" (*Smith* v. *Whittier*, 95 Cal. 279, 297, [30 Pac. 529, 534]; *Englebretson* v. *Industrial Accident Commission*, 170 Cal. 793, 798 [151 Pac. 421, 10 N. C. C. A. 545].)

Beyond all this, the evidence relied on, even if it could be regarded as tending to show with sufficient precision the making of any contract, fails utterly to support the precise contract alleged and found. The only agreement which may be said to be even suggested by the proof is one to leave all of the property to the plaintiff. The agreement alleged and found, and the one which the court undertakes to enforce, is

one to give the plaintiff a child's share of the estate, an agreement which the court interprets as one calling for a third of the estate.

Without further elaboration, we repeat that the evidence is entirely insufficient to justify the finding which we have discussed. Accordingly, the judgment cannot be supported. We are not unmindful of the settled rule that the findings of a trial court upon conflicting evidence are conclusive here, and that all reasonable inferences are to be indulged to support the findings. This rule does not, however, justify the sustaining of a finding when it has not the support of substantial evidence.

It becomes unnecessary to consider other points made by the appellants.

The judgment is reversed.

Shaw, J., and Lawlor, J., concurred.

Hearing in Bank denied.